```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------x

 3    MALIK L. BROWN,

 4                    Plaintiff,

 5              -against-                    21 Civ. 214
                                            Decision
 6    STEPHEN URBANSKI, et al.,

 7                    Defendants.

 8    ------------------------------------x

 9
                                    United States Courthouse
10                                  White Plains, New York

11                                  March 15, 2022

12

13                    THE HONORABLE CATHY SEIBEL,
                             District Judge
14

15

16    MALIK L. BROWN
              Pro Se
17


18
      MARIA B. HARTOFILIS
19              Attorney for Defendants

20

21

22

23

24

25
```

1                THE DEPUTY CLERK:  Judge, this matter is Brown v.

2    Urbanski.  We have on the line the plaintiff, Mr. Malik Brown,

3    we have on representing defendants from New York State Office

4    of the Attorney General, Ms. Maria Barous Hartofilis.  Our

5    court reporter, Angela, is on, and Andy is on.

6                THE COURT:  All right, I'm prepared to rule on the

7    motion to dismiss.  Does anybody have anything to add that's

8    not covered by the papers?

9                MS. HARTOFILIS:  No, your Honor.  Good morning.

10               MR. BROWN:  I feel like -- good morning, by the way.

11               THE COURT:  Same to you.

12               MR. BROWN:  I feel like I have stated -- I feel like

13   I stated my case in the best possible way, and I'm feeling

14   really confident about your decision.

15               THE COURT:  All right, well, let me get to it.  It's

16   going to take a while because there are a lot of different

17   claims and different defendants, so you may want to take notes.

18               Defendants have moved to dismiss the complaint.  For

19   purposes of the motion, I accept as true the facts, although

20   not the conclusions, set forth in the original complaint, which

21   is ECF number 2, the amended complaint, which is ECF number 30,

22   which I'm going to call the AC, plaintiffs memorandum in

23   opposition to the motion, which is ECF number 37, which I'm

24   going to call plaintiff's opposition, and ECF number 39 which

25   is plaintiff's sur-reply.  *See Voltaire v. Westchester County*,

1    2016 WL 4540837 at *3 (S.D.N.Y. August 29, 2016), which says a

2    court is allowed to consider factual allegations from a *pro se*

3    plaintiff's preceding complaints in order to supplement those

4    in amended complaints, *Washington v. Westchester*, 2015 WL

5    408941 at *1, n.1 (S.D.N.Y. January 30, 2015), which likewise

6    says a court can consider facts from a *pro se* plaintiff's

7    original complaint, even if they haven't been repeated in the

8    amended complaint.  And *Braxton v. Nichols*, 2010 WL 1010001 at

9    *1 (S.D.N.Y. March 18, 2010) which says allegations in a *pro se*

10   plaintiff's memorandum of law where they're consistent with

11   those in the complaint can also be considered on a motion to

12   dismiss.

13        My chambers will send Mr. Brown copies of any

14   unpublished decisions I cite today.

15        I do note that under my individual rules of practice

16   sur-replies are not permitted without prior permission.

17   Plaintiff's sur-reply was filed without permission, but I will

18   nevertheless consider the allegations in the sur-reply in light

19   of the special solicitude with which *pro se* submissions are to

20   be treated.  It would be a waste of time to disregard those

21   allegations, because if I were to do so, I would then have to

22   let plaintiff amend and we'd be right back where we started.

23   But plaintiff is now on notice and going forward I will not

24   consider sur-replies or other unauthorized submissions.  *See*

25   *Nichols* and *also Guity v. Uniondale*, 2017 WL 9485647 at *7

1    (E.D.N.Y. February 23, 2017) *report and recommendation adopted*

2    2017 WL 1233846 (E.D.N.Y. March 31, 2017).

3           I likewise, in addition to considering these

4    submissions, consider any documents attached to them.  *See*

5    *Kleinman v. Elan*, 706 F.3d 145, 152.  So based on all those

6    sources, the facts, taking plaintiff's allegations as true, are

7    as follows.

8           Plaintiff is incarcerated in the custody of New York

9    State Department of Corrections and Community Supervision, or

10   DOCCS.  During the events relevant to the lawsuit, he was held

11   a Fishkill Correctional Facility in Beacon.

12          On June 14, 2020, while in the keep-lock recreation

13   yard at Fishkill, another inmate assaulted plaintiff causing a

14   number of injuries.  I note the plaintiff doesn't state his

15   attacker's name, and some of the records he submitted redact

16   this person's name.  Plaintiff submitted a document with his

17   opposition papers that appear to be someone's notes on

18   surveillance footage showing the assault.  That's in

19   plaintiff's opposition at page 3, and plaintiff says these

20   notes were obtained by PLS.  He doesn't explain what that is,

21   but it may be an acronym for prison legal services.  Those

22   notes refer to the inmate who assaulted plaintiff as

23   Mr. Collins, and I will use that name for the assailant

24   throughout this opinion.

25          At the time of the assault on June 14, 2020,

1   plaintiff was serving a disciplinary sentence in the Special

2   Housing Unit or SHU.  He alleges that while in the SHU he was

3   denied an hour of unrestrained recreation time, then he says he

4   was only given outdoor recreation time while in mechanical

5   restraints, which he states occurred in an overcrowded

6   keep-lock yard in the baking sun with limited bathroom and

7   water breaks.  Pages 6 and 7 of the AC.  And those are the

8   numbers generated by the court's electronic case filing system.

9           Plaintiff characterizes Collins as a "known violent

10  inmate" with an "extreme history of violence" at Fishkill.

11  That's the complaint at 8 and the AC at 7.  He alleges that

12  Collins was in the box at Fishkill due to an assault on a

13  corrections officer.  That's in his opposition at 1.  He also

14  alleges that he and Collins have had past issues, complaint at

15  6, but does not explain the nature of these issues, whether he

16  ever reported them to anyone or the specifics of any past

17  violent incidents involving Collins beyond the detail that one

18  incident allegedly involved an attack on the CO.

19          Plaintiff alleges that on the date of the attack, he

20  and Collins, along with other inmates, were brought to the yard

21  in mechanical restraints, including waist chains.  Complaint at

22  6.  Collins' waist chains were not properly secured and he was

23  able to slip out of them and roam the yard for about ten

24  minutes.  Complaint at 6 to 8, plaintiff's opposition at 3.

25  After which he assaulted plaintiff.  Amended complaint at 6.

1  Collins struck plaintiff at least 13 times with the lock and

2  chain of his unsecured waist restraint.  Complaint at 6.  AC at

3  6.  Plaintiff's opposition at 3.

4         The surveillance video notes incorporated into

5  plaintiff's opposition memorandum allege that the surveillance

6  footage shows the following:  At around 9:18 a.m. Collins walks

7  away from a crowd of other on inmates and then "appears to be

8  straightening his arms in a downward motion" and "bends over

9  and appears to be doing something with his arms," after which

10 he "stands up, turns around, and with his arms relaxed, walks

11 back" to where he had been standing.  No officers can be seen

12 observing these actions on the video.  Ten minutes later, at

13 around 9:28 a.m., the video allegedly shows Collins "bending

14 over and fiddling with something in front of him" and then

15 "pulling something up with his right hand."  In the following

16 minute there was a short verbal exchange between the plaintiff

17 and Collins, and Collins then begins swinging the chain at

18 plaintiff continuing to do so after plaintiff falls to the

19 ground.  The attack is ongoing about 33 seconds until

20 corrections officers "pull Collins off of plaintiff."  That's

21 plaintiff's opposition at 3.

22        Five of the defendants, all DOCCS employees, were

23 present in the yard for all or part of the attack; Sergeant

24 Deacon and Correction Officers Yunes, DelBianco, Walsh and

25 Minard.  AC at 6-7 and 12-23.  Plaintiff alleges that Yunes

1    stood close by during the assault and did not intervene.  AC at

2    6.  He alleges that Deacon and other correction officers

3    watched his assault from beginning to end.  In addition, he

4    alleges that Deacon ordered DelBianco to use pepper spray and

5    DelBianco came to plaintiff and applied pepper spray after

6    Collins had already been subdued, which exposed plaintiff's

7    open wounds to the pepper spray chemical.  AC at 6 to 7 and

8    plaintiff's sur-reply at 2.  He alleges that Minard and Walsh,

9    along with Deacon, had foreseen the assault.  AC at 7.

10           After the assault, each of the above-named officers,

11   as well as the non-party correction officer, wrote a

12   use-of-force report, redacted copies of which are attached to

13   the amended complaint at pages 12-23.  The use-of-force reports

14   are redacted in an apparent attempt to avoid disclosing

15   plaintiff's attacker's name.  In addition, other portions of

16   the use-of-force report, including a section for the reporter

17   to set forth any actions taken following the use of force, are

18   redacted.  It's not clear who made the redactions and they are

19   not otherwise explained in the parties' submissions, but some

20   of them appear to relate to the attacker rather than to

21   plaintiff.

22           The time of the incident stated in the use-of-force

23   report contradicts the times reported on the surveillance video

24   notes.  Each report states the assault happened at about

25   10:05 a.m.  Deacon, Minard, and DelBianco also reported that

1   Collins had not yet been subdued when DelBianco used pepper

2   spray on both Collins and plaintiff.  That's at pages 15, 17,

3   and 19.  The other three officers' reports do not mention the

4   use of pepper spray.  While Deacon's report states that

5   DelBianco applied the pepper spray towards Collins' face,

6   DelBianco's report states that the spray "had the desired

7   effect on both inmates."

8        A partially redacted copy of the DOCCS unusual

9   incident report regarding this incident is also attached to the

10   AC at pages 27-29.  As with the use-of-force reports, the

11   redactions in the unusual incident report are not explained.

12   Like the use-of-force reports, the unusual incident report

13   reflects that the incident occurred at 10:05 a.m. and Collins

14   had not yet been subdued when DelBianco used pepper spray.  The

15   unusual incident report suggests that the pepper spray was used

16   on plaintiff stating that the pepper spray "had the desired

17   effect on inmate Brown."  That's the amended complaint at page

18   28.

19        Plaintiff alleges he was taken to the medical unit

20   more than 30 minutes after the attack ceased, and once there,

21   had to wait an additional 20 minutes to be examined.  AC at 8,

22   opposition at 3.  Plaintiff was examined by defendant Cebron, a

23   nurse at Fishkill.  AC at 5.  He alleges he was given

24   inadequate care and then sent to the hospital only to be

25   returned to the Fishkill and sent on the hospital later that

1    night for a "unseen, untreated head wound."  AC at 9.  See

2    pages 24-25.  Plaintiff claims that Nurse Cebron then falsified

3    her report to corroborate her account of the officials who

4    responded to the assault.  See pages 8-9.  Plaintiff initiated

5    this action on January 8, 2021.  On May 25, defendants filed a

6    pre-motion letter in anticipation of their motion to dismiss.

7    On June 29 we had a conference at which I granted plaintiff

8    leave to amend the complaint.  Plaintiff filed the amended

9    complaint on July 16 and this motion followed.

10            The legal standard for a motion to dismiss for

11   failure to state a claim is well-known, it comes from *Ashcroft*

12   *v. Iqbal*, 556 U.S. 662, 678 and *Bell Atlantic v. Twombly*, 550

13   U.S. 544.  In short, the plaintiff must provide sufficient

14   factual content to state a claim that's plausible on its face.

15            When defendant moves to dismiss under Federal Rule of

16   Civil Procedure 12(b)(1) for lack of subject matter

17   jurisdiction, the standard is different.  A court may dismiss

18   for lack of subject matter jurisdiction if it lacks the

19   statutory or constitutional power to adjudicate it.  In fact,

20   it must.  *Cortlandt Street Recovery Corp. v. Hellas*, 790 F.3d

21   411, 416-17.  When jurisdiction is challenged, the party

22   asserting jurisdiction bears the burden of showing by a

23   preponderance of the evidence that it exists, and the court can

24   examine evidence outside of the pleadings to make that

25   determination.  *Arar v. Ashcroft*, 532 F.3d 157, 168.

1          Complaints by *pro se* plaintiffs are to be examined

2     with special solicitude*, Tracy v. Freshwater*, 623 F.3d 90, 102,

3     interpreted to raise the strongest arguments that they suggest*,*

4     *Burgos v. Hopkins*, 14 F.3d 787, 790, and held to less stringent

5     standards than formal pleadings drafted by lawyers. *Hughes v.*

6     *Rowe* 449 U.S. 5, 9.  Nevertheless, "threadbare recitals of the

7     elements of a cause of action supported by mere conclusory

8     statements do not suffice," and district courts "cannot invent

9     factual allegations" that the plaintiff has not pleaded.

10    *Chavis v. Chappius*, 618 F.3d 162, 170.

11         The other legal standard that's relevant here relates

12    to qualified immunity which shields a government official from

13    liability for civil damages if either the official's conduct

14    does not violate clearly established statutory or

15    constitutional rights of which a reasonable person would have

16    known, *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 *(per curiam)*; or

17    if it was objectively reasonable for the official to believe

18    his actions or her actions were lawful at the time.  *Simpson v.*

19    *New York* 793 F.3d 259, 268.  The objective reasonable test is

20    met and the defendant is entitled to immunity if officers of

21    reasonable competence could disagree on whether the defendant's

22    actions were legal.  *Thomas v. Roach*, 165 F.3d 137, 143.  Under

23    the objective element, the Court has to look beyond generalized

24    constitutional protection, such as the right to be free of

25    unreasonable searches and seizures, and determine whether the

1    law is clearly established in a more particularized sense,

2    given the specific factual situation with which the officers is

3    confronted.   *Kerman v. City of New York*, 261 F.3d 229, 236.

4            Qualified immunity entitles public officials to

5    immunity from suit rather than a mere defense to liability and

6    is effectively lost if a case is erroneously permitted to go to

7    trial.   *Mitchell v. Forsyth*, 472 U.S. 511, 526.   Thus, the

8    Supreme Court repeatedly has stressed the importance of

9    resolving immunity questions at the earliest possible stage.

10   *Pearson v. Callahan*, 555 U.S. 223, 232.   Indeed, the point of

11   qualified immunity is to ensure that insubstantial claims

12   against government officials will be resolved prior to

13   discovery.   *Pearson* at 231.   But qualified immunity motions

14   often fail at the motion to dismiss stage because the facts in

15   the plaintiff's complaint do not suffice to make out the

16   defense.   *Ruffin v. Travers-Marsh,* 2018 WL 3368726 at *7

17   (S.D.N.Y. July 10, 2018) (collecting cases).

18           I'm going to start with the official capacity claims

19   plaintiff asserts in AC at 5 that he's bringing his claims

20   against the defendants in their official and individual

21   capacities.   But DOCCS officials enjoy Eleventh Amendment

22   immunity from suit under Section 1983 for damages in their

23   official capacities.   *Gunn v. Bentivenga*, 2020 WL 2571015 at *3

24   (S.D.N.Y. 2020); *see Ortiz v. Russo*, 2015 WL 1427247 at *5

25   (S.D.N.Y. March 27, 2015).   Suing an employee of the state in

1   the employee's official capacity is the same as suing the

2   state, and that's not allowed under the Eleventh Amendment.  So

3   the claims against the defendants in their officials capacities

4   are dismissed for lack of subject matter jurisdiction, but the

5   claims against them in their individual capacities remain, and

6   so I turn to the failure to protect claims against Yunes,

7   Deacon, DelBianco, Minard and Walsh, all of whom responded to

8   the attack.

9        "The Eighth Amendment requires prison officials to

10  take reasonable measures to guarantee the safety of inmates in

11  their custody."  *Hayes v. New York City*, 84 F.3d 614, 620,

12  citing *Farmer v. Brennan*, 511 U.S. 825, 833.  To prevail on a

13  claim that officials have failed to protect an inmate from

14  harm, a plaintiff has to demonstrate that objectively the

15  conditions of his incarceration posed a substantial risk of

16  serious harm, and subjectively that the defendant acted with

17  deliberate indifference to that risk.  *Farmer* at 834, and *Hayes*

18  at 620.  "A prison official has sufficient culpable intent if

19  he has knowledge that an inmate faces a substantial risk of

20  serious harm and he disregards that risk by failing to take

21  reasonable measures to abate the harm."  *Hayes* at 620.  A

22  plaintiff must show that prison officials actually knew of but

23  disregarded an excessive risk to his safety.  "The official

24  must both be aware of facts from which the inference could be

25  drawn that a substantial risk of serious harm exists, and he

1   must also draw the inference." *Farmer* at 837; *see Tangreti v.*
2   *Bachman*n, 983 F.3d at 619.  Thus, to state the cognizable
3   section 1983 claim, a prisoner must allege actions or omissions
4   sufficient to demonstrate deliberate indifference.  Mere
5   negligence will not suffice.  *Hayes* at 620.

6          I'm first going to discuss the failure to protect
7   before the attack.

8          A plaintiff can state a failure to protect claim by
9   alleging that he informed a prison official about a specific
10  fear of assault and was then assaulted, but communications
11  about generalized safety concerns or vague concerns of future
12  assault by unknown individuals are insufficient to knowledge
13  that an inmate is subject to a substantial risk of serious
14  harm.  *Marshall v. Griffin*, 2020 WL 1244367 at *9 (S.D.N.Y.
15  March 16, 2020).  While plaintiff broadly alleges that he had
16  "past issues" with Collins, complaint at 6, he does not specify
17  what those issues were, nor does he allege that he reported
18  them to prison officials, much less if he reported a specific
19  fear of assault that would have put any defendant on notice of
20  a substantial risk to his safety.

21         But alternatively a plaintiff can state a claim based
22  on a failure to protect him against a general risk of harm to
23  all inmates in the facility by alleging that the defendants
24  knew of a history of prior inmate-on-inmate attacks similar to
25  the one suffered by the plaintiff and that the measures they

should have taken in response to those prior attacks would have prevented the attack on the plaintiff. *Parris v. DOCCS*, 947 F.Supp.2d 354, 363 (S.D.N.Y. 2013); *see Bladon v. Aitchison*, 2019 WL 12067370 at *7 (S.D.N.Y. March 14, 2019).  This generally requires the plaintiff to establish a "longstanding, pervasive, well-documented history of similar attacks, coupled with circumstances suggesting that defendant official being sued had been exposed to this information." *Stephens v. Venettozzi*, 2016 WL 929268 at *21, (S.D.N.Y. February 24, 2016), *report and recommendation adopted*, 2016 WL 1047388 (S.D.N.Y. March 10, 2016).

Plaintiff alleges that his attack was a "known violent inmate," AC at 6, who previously attacked a correction officer and had "an extreme history of violence" in the prison. Opposition at 1.  But saying the attacker was generally violent does not suffice.  Some prisoners are violent people and may act out in prison, but it is not practical to segregate all such people, and accordingly, the law requires a plaintiff to plausibly allege a history of similar attacks and a way the attack in question could reasonably have been prevented.  Here, plaintiff does not describe any prior inmate-on-inmate attacks at all by Collins or anyone else, let alone any similar to the one suffered by him on June 14, 2020.  Nor does he provide facts showing that any individual defendant was aware of any such attacks or suggest what measures should have been taken in

1   response.  *See Coronado v. Goord*, 2000 WL 1372834 at *6,

2   (S.D.N.Y. September 25, 2000) which said a general allegation

3   of prior violence insufficient to show knowledge of a risk

4   where no details were provided as to the type or level of

5   violence or whether it was similar enough to put the defendants

6   on notice.

7        Nor does plaintiff allege that any defendant knew

8   that Collins had removed his waist chain.  Plaintiff alleges

9   that Collins was allow to roam the yard without his waist

10  chain, AC at 6 and 8, but he does not allege that any defendant

11  actually knew that Collins had removed his waist chain.  The

12  surveillance video notes that Collins can be seen from behind

13  doing something with his arms and bending over, but those

14  observations do not allege that even if an official was

15  observing Collins it was clear that he was removing his waist

16  chain.  Moreover, the video notes say that no COs can be seen

17  from the camera's perspective observing Collins.  And while

18  plaintiff alleges vaguely that Minard, Walsh, and Deacon had

19  foreseen the assault, this allegation is entirely conclusory.

20  Plaintiff does not allege that any officer saw Collins remove

21  his waist restraint or noticed that it had been removed before

22  the assault began.

23       In short, while the officers in the yard should have

24  seen that Collins was unrestrained if they had been paying

25  attention, there are no facts suggesting that their failure to

1  pay attention was deliberate.  There is no allegation that

2  defendants' apparent failure to recognize the potential harm

3  here, in other words, that Collins had slipped out of his waist

4  chain, was anything other than negligent.  As plaintiff himself

5  states in his amended complaint, "For over ten minutes my

6  attacker roamed the KL yard with no waist chain.  How do you

7  miss that?"  AC at 8.  That allegation amounts to an allegation

8  of negligence or dereliction of duty, not of willful and

9  knowing disregard of a specific threat.  *See Farmer* at 838

10 where the court said that an official's failure to alleviate a

11 significant risk that he should have perceived but did not,

12 while no cause for commendation, cannot be condemned as the

13 infliction of punishment under the Eight Amendment.  Likewise,

14 the fact that officials may have been negligent in failing to

15 secure Collins' restraint does not suffice*, see Hayes* at 620,

16 which points out that negligence is in sufficient.

17          Plaintiff's complaint thus lacks allegations that any

18 prison official knew of and disregarded a substantial risk of

19 serious harm to plaintiff during his attack.  To the contrary,

20 the facts plaintiff provides suggest a surprise attack, which

21 is insufficient to support a deliberate indifference claim.

22 *See e.g. Rivera v. Royce*, 2021 WL 2413396 at *8 (S.D.N.Y.

23 June 11, 2021)(collecting cases).  I've concluded the

24 subjective prong is not met, so I need not address the

25 objective prong.  *Marshall*, at 2.  Accordingly, the

1    failure-to-protect claim based on defendant's conduct before

2    the assault is dismissed.

3           I now turn to failure-to-protect during the assault.

4           Plaintiff alleges that Yunes failed to intervene and

5    left him to fend for himself once the attack started.  AC at 6.

6    He further alleges that Deacon, Minard, and Walsh were in sight

7    of the assault from beginning to end and failed to properly

8    intervene.  AC at 6 and complaint at 6.  "In the context of a

9    failure-to-intervene claim, an officer displays deliberate

10   indifference when he has adequate time to assess a serious

11   threat against an inmate and a fair opportunity to protect the

12   inmate without risk to himself, yet fails to intervene."  *Henry*

13   *v. County of Nassau*, 2015 WL 2337393 at *7 (E.D.N.Y. May 13,

14   2015).  The law in this circuit is clear that officers are

15   under no obligation to put their safety at risk by intervening

16   in inmate fights.  *Velez v. City of New York*, 2019 WL 3495642

17   at *5, (S.D.N.Y. August 1, 2019).  Where an inmate-on-inmate

18   fight is not long enough that an officer present at the scene

19   would have had a reasonable opportunity to attempt to prevent

20   the attack from continuing, a plaintiff can't establish a

21   section 1983 failure to intervene claim.  *Henry* at 7.

22           First, plaintiff seems to allege that at the outset

23   of the attack Yunes was nearby but alone.  Yunes' failure to

24   intervene before other officers were on hand does not reflect

25   deliberate indifference because "it is well established that a

1    failure to intervene in an inmate-on-inmate assault is not

2    actionable if, in so doing, an officer would have subjected

3    himself or others to harm.  *Rosario v. Nolan*, 2021 WL 2383769

4    (W.D.N.Y. March 22, 2021) *report and recommendation adopted*,

5    2021 WL 2380818 (June 10, 2021).  *See Blaylock v. Borden*, 547

6    F.Supp 2d.  305, 312 (S.D.N.Y. 2008), which said it was

7    reasonable for an officer who was alone with two inmates, one

8    of whom had a weapon, to call for backup instead of jumping

9    into the fight himself, *aff'd* 363 F.App'x 786, and *Velez-Shade*

10   *v. Population Management*, 2019 WL 4674768 at *6 (D. Conn.

11   September 25, 2019), which granted a motion to dismiss where a

12   lone officer waited two minutes until backup arrived to

13   intervene in an altercation involving three inmates.

14           Second, the video notes on which plaintiff relies

15   reflect that just over 30 seconds elapsed between the time at

16   which Collins began swinging the waist chain at plaintiff and

17   the time at which officers pulled Collins off of plaintiff.

18   Plaintiff's opposition at 3.  This belies plaintiff's

19   suggestion that the prison officials named in his complaint

20   delayed in intervening or stood by as the attack was ongoing.

21   *See Ewers v. City of New York*, 2021, WL 2188128 at *7

22   (S.D.N.Y. May 28, 2021) finding no failure to protect when

23   officers arrived within seconds to break up a fight, and *Henry*

24   at 7, finding no failure to intervene where the fight lasted

25   one-to-two minutes.

1          Accordingly, plaintiff's failure-to-protect claim

2    bassed on defendants' conduct during the assault is dismissed.

3          I next turn to excessive force.

4          Plaintiff advances excessive force claims on Deacon

5    and DelBianco, alleging that in the wake of the attack in which

6    plaintiff was the victim, DelBianco pepper-sprayed him on

7    Deacon's orders, AC at 7, after plaintiff's attacker had

8    already been subdued.  Plaintiff's sur-reply at 2.

9          An Eighth Amendment excessive force claim generally

10   requires a subjective and objective showing.  "The subjective

11   component of the claim requires a showing that the defendant

12   had the necessary level of culpability shown by actions

13   characterized by wantonness in light of the particular

14   circumstances surrounding the challenged conduct.  For

15   excessive force claims, as contrasted with other actions or

16   inactions that rise to the level of Eighth Amendment

17   violations, the test for wantonness is whether the force was

18   used in a good faith effort to maintain or restore discipline

19   or maliciously and sadistically to cause harm.

20         To determine whether defendants acted maliciously or

21   wantonly, the Court must examine several factors, including the

22   extent of the injury and the mental state of the defendant, as

23   well as the need for the application of force, the correlation

24   between that need and the amount of force used, the threat

25   reasonably perceived by the defendant and any efforts made by

1    the defendants to temper the severity of a forceful response.

2         Accordingly, determining whether officers used

3    excessive force necessarily turns on the need for the force

4    used.  *Harris v. Miller*, 818 F.3d 49 at 63.

5         The objective inquiry looks to whether the conduct

6    was objectively harmful enough or sufficiently serious to reach

7    constitutional dimensions, an inquiry that is context specific

8    and turns on contemporary standards of decency.  *Harris* at 64.

9    When prison officials maliciously and sadistically use force to

10   cause harm, contemporary standards of decency are always

11   violated.  The objective element is satisfied in the excessive

12   force context even if the victim does not suffer serious or

13   significant injury, as long as the amount of force used is not

14   minimal.  *Harris* at 64.  But the extent of the injury suffered

15   is relevant to the Eighth Amendment inquiry insofar as it

16   indicates the amount of force applied.  *Rodriguez v. City of*

17   *New York*, 802 F.Supp. 2d 477, 481 (S.D.N.Y. 2011).

18        The use of pepper spray constitutes a significant

19   degree of force.  *Tracy* at 98.  While "deployment of a chemical

20   agent is an accepted means of controlling an unruly or

21   disruptive inmate," *Jones v. Wagner*, 2020 WL 4272002 at *3 (D.

22   Conn. July 24, 2020), use of pepper spray is impermissible

23   where it is deployed "in greater quantities than necessary or

24   for the sole purpose of punishment or infliction of pain."

25   *Vazquez v. Spear*, 2014 WL 3887880 at *5 (S.D.N.Y. August 5,

1  2014); *see Jones* at 3 where the court said "A constitutional

2  violation can occur when a use of a chemical agent is

3  malicious.

4          Numerous courts in this circuit have held that the

5  use of pepper spray against an incarcerated individual who is

6  neither resisting nor posing a threat to correction officers is

7  a viable ground for an excessive-force claim. *See Johnson v.*

8  *Schiff*, 2019 WL 4688542 at *19 (S.D.N.Y. September 26, 2019),

9  which said "while the use of a single burst of a chemical agent

10 which is not a dangerous quantity is a constitutionally

11 acceptable means of controlling an unruly or disruptive inmate.

12 Here, plaintiff squarely alleges that he was fully cooperative,

13 that defendants were on the other side of the cell bars and

14 thus not plausibly in danger and that the pepper spray was

15 intentionally sprayed directly into plaintiff's eyes and face

16 an onto his hair causing him excruciating pain that lasted for

17 two weeks." *See also Pena v. Aldi*, 2019 WL 2193465 at *2 (D.

18 Conn. May 21, 2019) finding a plausible excessive-force claim

19 where the officers pepper sprayed an inmate in the face who had

20 just been involved in a fight but was handcuffed. *Solek v.*

21 *Naqvi*, (D. Conn. December 23, 2016), which denied a motion to

22 dismiss where the plaintiff alleged that the defendant sprayed

23 the chemical agent after the plaintiff was handcuffed and not

24 resisting. *Lang v. Zurek*, 2018 WL 6069468 at *5 (N.D.N.Y.

25 October 17, 2018), which denied the motion to dismiss even

1   though the complaint suggested plaintiff may have precipitated

2   the use of force by his refusal to return to his cell and his

3   subsequent attempt to run, but there was no indication as to

4   the length, amount, or proximity of the pepper spray

5   deployment, *report and recommendation adopted*, 2018 WL 6068416

6   (November 20, 2018); *Wunner v. Smith*, 2022 WL 161463 (S.D.N.Y.

7   January 18, 2022), where a pre-trial detainee stated a claim

8   where he was pepper-sprayed multiple times while pleading for

9   help and not actively resisting, and *Taylor v. Quayyum*, 2021 WL

10  6065743 at *5 (S.D.N.Y. December 21, 2021), finding a claim

11  stated where the pre-trial detainee plausibly alleged that the

12  officer pepper-sprayed the plaintiff merely because the

13  plaintiff had cursed at the officer not because there was a

14  security issue.  And *also see Tracy* at 99 which found a

15  reasonable juror could find the use of pepper spray inches away

16  from the face of a defendant already in handcuffs and not

17  actively resisting could be an unreasonable use of force.

18          While the defendants here were responding to an

19  assault by an armed inmate, unquestionably giving them

20  reasonable concern for their own safety and that of other

21  inmates while the attack was ongoing, plaintiff alleges that

22  DelBianco came to him and applied pepper spray after that armed

23  inmate had been subdued, plaintiff's sur-reply at 2, and that

24  Deacon ordered the use of force against him.  AC at 6 to 7.

25  This occurred in the wake of an apparently vicious attack in

 1   which plaintiff asserts he was "always the victim," AC at 7,

 2   from which I infer the plaintiff was not himself a risk to the

 3   officers.  Defendants point to the surveillance video notes

 4   which indicate plaintiff was kicking at Mr. Collins as evidence

 5   the plaintiff was fighting back and, thus, the use of pepper

 6   spray on both inmates was reasonable to restore order.  They

 7   make that argument at ECF number 38 at page 6.  But the video

 8   notes only indicate that plaintiff was kicking his legs in

 9   self-defense while Collins was attacking him.  Plaintiff's

10   allegation that the use of pepper spray came later after

11   Collins was subdued.  Sur-reply at 2.  Thus, the disturbance on

12   which defendants rely had, according to plaintiff, already

13   subsided.

14          The video may show exactly when the pepper spray was

15   used and what plaintiff was doing, if anything, at the time and

16   it or other evidence may show at summary judgment or trial that

17   Deacon's order and DelBianco's conduct were reasonable given

18   the circumstances, but I must take plaintiff's allegations as

19   true at this stage.  The allegations that Collins was already

20   subdued as DelBianco pepper-sprayed plaintiff on Deacon's

21   orders render it plausible that the pepper spray was deployed

22   and the order given to cause harm rather than in a good faith

23   effort to maintain or restore discipline.

24          Defendants argue they are nonetheless entitled to

25   qualified immunity.  For qualified immunity to bar suit at the

1  motion to dismiss stage, not only must the facts supporting the

2  defense appear on the face of the complaint, but as with all

3  12(b)(6) motions, the plaintiff is entitled to all reasonable

4  inferences from the facts alleged, not only those that support

5  his claim but also those that defeat the immunity defense.

6  *Vann v. Fischer*, 2012 WL 2384428 at *10 (S.D.N.Y. June 21,

7  2012); *see Hyman v. Abrams*, 630 F.App'x 40, 42, which noted

8  that usually qualified immunity cannot support the grant of a

9  12(b)(6) motion.  As I've just discussed, a gratuitous and

10  unjustified use of pepper spray against a plaintiff who is not

11  resisting is a constitutional violation.  *See Tracy* at 98 at

12  n.5.  At this stage, I cannot say it would have been

13  objectively reasonable for DelBianco to believe it was lawful

14  for him to approach and pepper-spray the victim of an assault

15  after the assaulter was already subdued, and the victim

16  presented no risk of harm, or for Deacon to order that action.

17  And I must credit these allegations at this stage, so it's

18  premature to determine that they're entitled to qualified

19  immunity.

20          So the motion to dismiss the excessive force claim

21  against Deacon and DelBianco is denied.

22          I then turn to deliberate indifference based on

23  medical care.

24          Plaintiff alleges this claim against Cebron for what

25  he asserts was inadequate medical care after the attack.  AC at

1    8 to 9.

2         The Eighth Amendment imposes a duty on prison

3    officials to ensure that inmates receive adequate medical care.

4    *See Farmer*, 832.  But not every lapse in medical care is a

5    constitutional wrong.  Rather, a prison official violates the

6    Eighth Amendment only when two requirements are met, one

7    objective one subjective.  *Salahuddin v. Goord*, 467 F.3d 263,

8    279.

9         First the prisoner must allege he was actually

10   deprived of adequate medical care as the official's duty is

11   only to provide reasonable care*, Salahuddin* at 279, and that

12   the alleged deprivation of medical treatment was sufficiently

13   serious.  That is, the prisoner must prove that his medical

14   need was a condition of urgency, one that may produce death,

15   degeneration or extreme pain.  *Johnson versus Wright*, 412 F.

16   398, 403; *see Williams v. Raimo*, 2011 WL 6026115 at *3

17   (N.D.N.Y. July 22, 2011) noting there's no litmus test for

18   deciding whether a condition is sufficiently serious, but a

19   court can look at, among other things, whether the impairment

20   is one that a reasonable doctor would find important and worthy

21   to treat, whether the condition affects the individual's daily

22   life, and whether it causes chronic and substantial pain.

23        Where a plaintiff's medical indifference allegations

24   amount to a delay in treatment, it's appropriate to focus on a

25   challenged delay rather than the underlying condition alone in

1   analyzing whether the alleged deprivation is objectively

2   serious enough to support an Eighth Amendment claim.  *Ray v.*

3   *Zamilus* 2017 WL 4329722 at *9 (S.D.N.Y. September 27, 2017).

4   On the one hand, a defendant's delay in treating an ordinarily

5   insignificant medical condition can become a constitutional

6   violation if the condition worsens and creates a substantial

7   risk of harm, but on the other hand, delay in treating a

8   life-threatening condition may not violate the Eighth Amendment

9   if the lapse does not cause any further harm beyond that which

10  would occur even with complete medical attention.  *Ray* at 9;

11  *see Pabon v. Wright*, WL 628784 at *8.  (S.D.N.Y. March 29,

12  2004), "A delay in treatment does not violate the Constitution

13  unless it involves an act or failure to act that evinces a

14  conscious disregard of a substantial risk of serious harm...The

15  Second Circuit has reserved such a classification for cases in

16  which, for example, officials deliberately delayed medical care

17  as a form of punishment, ignored a life-threatening and

18  fast-degenerating condition for three days or delayed major

19  surgery for over two years."

20          Second, the inmate must allege that the charged

21  official knew of and disregarded an excessive risk to inmate

22  health or safety.  As noted earlier, the officer must have both

23  been aware of the facts from which the inference could be drawn

24  that there was a substantial risk of serious harm and must have

25  drawn the inference.  *Johnson* 412 F.3d at 403, quoting *Farmer*

at 837; see *Phelps v. Kapnolas*, 308 F.3d 108, 186 (*per curiam*), which equated deliberate indifference with criminal recklessness.  Neither mere disagreement over the proper treatment or medical malpractice are constitutional violations merely because the victim is a prisoner.  *Estelle v. Gamble*, 429 U.S. 97, 106, and *Chance v Armstrong*, 143 F.3d 698, 703. Rather, to state an Eighth Amendment deliberate indifference claim, an inmate must show that the defendants acted or failed to act while actually aware of the substantial risk that serious harm would result.  *Farid v. Ellen*, 593 F.3d 233, 248. Prison officials may be found free from liability if they responded reasonably to the risk even if the harm was not averted.  *Farmer* at 844.

Plaintiff's allegations against Cebron failed to satisfy the standards.  First, while plaintiff alleges that his initial treatment was delayed by about an hour, he does not allege that this delay caused his condition to worsen in any significant way nor does he allege that it was Cebron who caused this delay in treatment.  Second, he alleges that he has an unseen, untreated head wound that caused him to be returned to the outside hospital but he also does not describe any serious harm caused by delay in treatment of that wound.

He also failed to allege any facts from which I could infer that Cebron acted with sufficiently culpable intent.  His head wound was unseen and untreated until the second time he

1   went to the hospital.  That multiple medical professionals, not

2   just Cebron, but everyone who saw him during his first trip to

3   the hospital apparently examined the plaintiff and failed to

4   notice or address this wound indicates that it was easy to miss

5   and Cebron's failure to treat it when she first examined was,

6   at most, negligent, it does not rise to the level of subjective

7   indifference necessary for an Eighth Amendment claim.  *See*

8   *Hogan v. Russ* 890 F. Supp. 146, 149 (N.D.N.Y. 1995).  So the

9   deliberate indifference claim against Cebron is dismissed.

10          I now turn to a claim regarding falsifying the

11  report.

12          Defendants don't address this, but plaintiff alleges

13  that Deacon, Yunes, DelBianco, Minard, Walsh and Cebron all

14  falsified reports related to the June 14 attack, AC at 6-8.

15  "Generally, a prison inmate has no constitutionally guaranteed

16  immunity from being falsely or wrongly accused of conduct which

17  may result in a deprivation of a protected liberty interest.

18  There are two exceptions to this general rule.  An inmate has a

19  claim where he can show either discipline without adequate due

20  process because of a false report or that the report was in

21  retaliation for exercising a constitutionally protected right."

22  *Perez v. Does*, 209 F.Supp. 3d 594, 598 (W.D.N.Y. 2016) quoting

23  *Willey v. Kirkpatrick*, 801 F.3d 51, 63.  Plaintiff has not

24  alleged that he was disciplined as a result of any of the

25  allegedly falsified reports filed in connection with the

1  attack, nor has he alleged that the reports were falsified in

2  response to his exercise of a constitutionally protected right.

3  His allegation is that defendants deliberately falsified their

4  reports to cover up their negligence or use of excessive force.

5  But even if true, this conduct does not rise to the level of a

6  constitutional violation.  *See Milner v. City of Bristol*, 2019

7  WL 3945525 at *3 (D. Conn. August 21, 2019), which dismissed

8  where the complaint did not allege additional facts to show

9  that any deprivation of liberty or adverse consequences

10  followed from the issuance of false police reports; and

11  *Heyliger v. Gebler*, at *2 and n.1 (W.D.N.Y. July 30, 2010),

12  which notes the Court dismissed claims alleging false reports

13  as part of a coverup whether disciplinary or not.  Odd as it

14  may seem, there is no general constitutional right to be free

15  from the cover-up of a past constitutional violation," and

16  "general allegations that a party conspired to cover up a past

17  constitutional violation are insufficient to establish

18  liability under section 1983."  *Paterson v Paterson*, 2019

19  WL 1284346 at *10 (W.D.N.Y. March 20, 2019).

20          I now turn to the conditions of confinement claim.

21          Plaintiff alleges that the conditions of his

22  confinement at the time the assault occurred, and specifically

23  the amount and type of exercise he was permitted, violated his

24  Eighth Amendment rights.  "To state an Eighth Amendment claim

25  against a prison official based on conditions of confinement,

1 an inmate must allege, one, objectively, the deprivation the

2 inmate suffered was sufficiently serious that he was denied the

3 minimal civilized measure of life's necessities, and, two,

4 subjectively, the defendant official acted with a sufficiently

5 culpable state of mind such as deliberate indifference of

6 inmate health and safety. *McCray v. Lee*, 963 F.3d 110, 117;

7 see *Farmer* at 834.

8   Read liberally, plaintiff's complaint alleges that

9 the conditions of his SHU confinement were unsafe.  When a

10 prisoner asserts a claim predicated on unsafe conditions, the

11 court must determine whether society considers the risk of

12 which the plaintiff complains to be so grave that it violates

13 contemporary standards of decency to expose anyone to that risk

14 unwillingly. *McCray* at 120, quoting *Helling v. McKinney*, 509

15 U.S. 25, 36.  In other words, the prisoner must show the risk

16 of which he complains is not one that today's society chooses

17 to tolerate. *McCray* at 120.  The objective element depends on

18 both the seriousness of the potential harm and the likelihood

19 that such injury to health will actually be caused. *Helling* at

20 36.

21   Plaintiff alleges generally that he spent 37 days

22 under restrictions that caused him to be mechanically

23 restrained in an overcrowded yard in the hot sun with one water

24 break and one bathroom break in an hour 15 minute recreation

25 period.  AC at 6.  While the conditions described by plaintiff

1   may be unpleasant, these allegations do not plausibly show that

2   the circumstances which, aside from the mechanical restraints,

3   are not dissimilar to those in which many people work or play,

4   were so dangerous or the deprivation so severe, that it

5   violates the Eight Amendment.

6          I next turn to deprivation of exercise.

7          Plaintiff alleges that for 37 days he was denied the

8   opportunity to partake in an hour of unrestrained recreation.

9   AC at 6.

10         The Second Circuit has held that some opportunity for

11  exercise must be afforded to prisoners.  *McCray* at 117

12  collecting cases.  The deprivation of exercise amounts to a

13  constitutional violation only where the inmate is denied "all

14  meaningful exercise" for a substantial period of time.

15  *Davidson v. Coughlin*, 968 F.3d 121, 129 (S.D.N.Y. 1997).  In

16  determining whether an exercise deprivation rises to this

17  level, the court may consider the duration of the deprivation;

18  the extent of it; the availability of other out-of-cell

19  activities; the opportunity for in-cell exercise; and the

20  justification for deprivation.  *Williams v. Goord*, 111 F.Supp.

21  2d 280, 292 (S.D.N.Y. 2000).

22         At this stage, 37 days appears to be in the range

23  that could be of sufficient duration to give rise to a

24  deprivation of exercise claim.  *See Williams* at 292, 293, which

25  found 28 days without unrestrained exercise sufficient for an

1    Eighth Amendment claim, and *McCray v. Lee*, citing cases where

2    other circuits held seven weeks and six-and-a-half weeks were

3    long enough.  And *Ruggiero v. Prack* (W.D.N.Y. 2016), which

4    found 22 days to be in the category of relatively brief and not

5    violating the Eighth Amendment.  So 37 days seems like it's in

6    the ballpark plausibly at this stage.

7            With regard to the extent of the deprivation, I infer

8    from plaintiff's allegations that his only out-of-cell exercise

9    time was an hour and 15 minutes in mechanical restraints in the

10   keep-lock yard.  AC at 6.  A requirement that an inmate

11   exercise only in full restraints may be found to infringe an

12   inmate's right to some meaningful opportunity for exercise.

13   *Edwards v. Arnone*, 613 F. App'x 44, 47.  Second Circuit has

14   declined to determine as a matter of law that and inmate's

15   "ability to shuffle around in full restraints while breathing

16   fresh air constitutes meaningful exercise."  *Edwards v. Quiros*,

17   986 F.3d 187, 194-95.  Similarly, the availability of in-cell

18   exercise does not establish a meaningful opportunity to

19   exercise as a matter of law.  *Edwards* 194-95.

20           Thus, the facts plaintiff alleges here are sufficient

21   to push his claim over the line from conceivable to plausible,

22   even absent details from which I can analyze the final three

23   *Williams* factors.  Construing plaintiff's allegations to raise

24   the strongest argument they suggest, and drawing reasonable

25   inferences in his favor, I find he has plausibly alleged a

1    deprivation of exercise claim under the Eighth Amendment at

2    least at this stage.

3             Defendants argue that Urbanski cannot be held liable

4    for any constitutional violation because plaintiff hasn't

5    alleged his personal involvement.  It is well settled in this

6    Circuit that personal involvement of defendants in alleged

7    constitutional deprivations is a prerequisite to an award of

8    damages under section 1983.  *Colon v. Coughlin, 58* F.3d 865,

9    873.  While *Colon* laid out a special test for supervisory

10   liability, outlining five ways a plaintiff could show personal

11   involvement of a supervisor, the Second Circuit has clarified

12   that under *Iqbal* the *Colon* test is invalid and a plaintiff has

13   to plead and prove that each defendant, through the official's

14   own individual actions, has violated the Constitution.

15   *Tangreti v. Bachmann*, 983 F.3d 609, 618.  Merely being in the

16   chain of command is insufficient.  *Tangreti* at 618.  While the

17   factors necessary to establish the 1983 violation will vary

18   with the constitutional provision at issue because the elements

19   of different claims vary, the violation must be established

20   against the supervisory official directly.  *Tangreti* at 618.

21            Defendants address their personal involvement

22   argument for Urbanski to plaintiff's broader complaints about

23   the safety issues raised by his confinement but they do not

24   specifically address his deprivation of exercise claim.  *See*

25   ECF number 36, 18 to 19.  Urbanski is alleged to be the deputy

1    superintendent of security for Fiskill, AC at 4, and plaintiff

2    alleges that he himself "issued a restraint order that deprived

3    plaintiff of recreation," complaint at 6, and "deprived

4    plaintiff of the right to exercise."  AC at 7.  Plaintiff's

5    pleadings are somewhat confusing because he states first that

6    Urbanski issued a restraint order, complaint at 6, and then the

7    amended complaint at 6 that Urbanski derived him of the right

8    to exercise without issuing any order as to why and how it

9    became so that, as a SHU inmate, plaintiff was not entitled to

10   an hour of unrestrained rec.  I read these allegations together

11   to mean that Urbanski ordered the restriction but failed to

12   provide further explanation of the reasons behind it.

13   Accepting those assertions as true at this stage, plaintiff has

14   successfully alleged Urbanski's personal involvement in the

15   deprivation of exercise.

16            Defendants also contend that Urbanski is entitled to

17   qualified immunity arguing that because he was not personally

18   involved he would not have known he was violating the Eighth

19   Amendment.  That's in their brief at 21 to 22.  But plaintiff,

20   giving him special solicitude, has pleaded personal

21   involvement.  Moreover, the law in the area would have been

22   clear to a reasonable official.  It is well established that

23   the Eighth Amendment mandates that inmates be provided some

24   opportunity for exercise, *see McCray* at 120, noting the right

25   of prisoners for a meaningful opportunity for exercise has been

1    clearly established for three decades before that case which

2    was before this one, and *Paul v. LaValley*, 712 F.App'x 78, 79,

3    finding the right to exercise well established by 1985.  It's

4    likewise well-established that denying an inmate the

5    opportunity to exercise without restraints can violate this

6    principle.  *Edwards v Arnone*, 613 F.App'x 47, which says that

7    under clearly established law a reasonable juror could conclude

8    that reasonable officers would agree that fully restraining

9    inmates during out-of-cell exercise without an adequate safety

10   justification is unconstitutional.  There may be an adequate

11   safety justification here, but I can't tell from the complaint

12   that there is, and so the motion to dismiss the deprivation of

13   exercise claim against Urbanski is denied.

14          Turning to Annucci.

15          To the extent plaintiff alleges that the claims that

16   are dismissed above should be brought against Annucci in his

17   supervisory capacity, those claims are dismissed because

18   there's no supervisory liability in the absence of an

19   underlying constitutional violation.  *See Raspardo v. Carlone*,

20   770 F.3d 97, 129.

21          With respect to the surviving claims, plaintiff has

22   not pleaded facts sufficient to establish that Anucci

23   personally through his own actions was involved in any of the

24   deprivations.  There are no facts from which I can infer his

25   involvement or culpability.  *See Tangreti* at 618.  So all

1   claims against Annucci are dismissed.

2         To the extent plaintiff advances state law claims,

3   including negligence, those must be dismissed under New York

4   Correction Law 24 which provides you can't sue a DOCCS employee

5   in his personal capacity for damages arising out of acts or

6   failures to act within the scope of his employment.  That's

7   New York Corrections Law section 24(1).  That section applies

8   to claims brought in this court. *Baker v. Coughlin*, 77 F.3d

9   12, 15, and therefore, plaintiff's precluded from raising state

10  law claims in federal court against state law employees in

11  their personal capacities for actions within the scope of their

12  employment. *Murphy v. Spalding,* 12022 WL 294552 at *10

13  (S.D.N.Y. February 1, 2022); *see Davis v. McCready*, 283 F.Supp.

14  3d 108, 123-24 (S.D.N.Y. 2017).  Defendants here were all

15  clearly acting within the scope of their employment, so any

16  state tort claims against them are dismissed.

17        Finally, as to leave to amend, it should be freely

18  given when justice so requires under Rule 15, but it's within

19  my discretion to grant or deny. *Kim v. Kimm*, 884 F.3d 98.

20  Leave is properly denied for repeated failure to cure

21  deficiencies by amendments previously allowed or for futility,

22  among other reasons. *Ruotolo v. City of New York*, 514 F.3d

23  184, 191.

24        Plaintiff has already amended once after having the

25  benefit of a pre-motion letter from defendants stating the

1   grounds on which they would move to dismiss.  That's ECF number

2   24, as well as my observations during the pre-motion

3   conference.  Failure to fix deficiencies in the previous

4   pleading after being provided notice of them is alone

5   sufficient ground to deny leave to amend.  *National Credit Unit*

6   *v. US Bank*, 898 F.3d 243, 247-58*; in Re Eaton Vance 380* F.Supp.

7   2d 220, 242 (S.D.N.Y. 2005), *aff'd* 481 F.3d 110, 118.

8          Further, plaintiff has not asked to amend again or

9   otherwise suggested he's in possession of facts that would cure

10  the deficiencies identified in this opinion.  And accordingly,

11  I decline to grant leave to amend on my own motion.  *See*

12  *TechnoMarine v. Giftports*, 758, F.3d 493, 505*; Gallop v.*

13  *Cheney*, 642 F.3d 364, 369; and *Horoshko v. Citibank*, 373 F.3d

14  248, 249-50.

15         So for these reasons the motion is granted in part

16  and denied in part.  The case will go forward against DelBianco

17  and Deacon based on excessive force arising from the use of

18  pepper spray and will go forward against Urbanski based on the

19  deprivation of exercise claim.

20         All other claims are dismissed.

21         The clerk of Court should terminate motion number 35

22  and terminate all defendants except Deacon, DelBianco and

23  Urbanski.

24         So now what happens, Mr. Brown, is discovery.  That

25  is an opportunity for each side to collect information that

1   they're going to want later on.  What often happens in cases

2   like this is that after discovery the defendants make what's

3   called a motion for summary judgment, which means they ask me

4   to toss the case out without a trial.  Usually their argument

5   is that even accepting the facts as the plaintiff described

6   them, they're entitled to win the case.  At that point, each

7   side has to provide evidence, not just allegations like you can

8   do in a complaint.  So during the discovery phase of the case,

9   each side collects whatever evidence it wants, and you can do

10  that a number of ways.  You can request documents from the

11  other side.  You can, if you're able to from where you are,

12  take depositions.  You're allowed to propound interrogatories,

13  which is just -- which are just questions that the other side

14  has to answer.  You can ask witnesses to give you affidavits

15  and, of course, the defendants can do the same thing.  They'll

16  take your deposition, I'm sure, and you can ask them for a copy

17  of the video or other things that you want from them.

18          And then if they make a motion, at that point, you

19  have to provide evidence.  The evidence can be your own

20  affidavit, it just has to be sworn or affidavits from other

21  witnesses and the first thing you have to do is make what are

22  called Rule 26 disclosures.  Rule 26 is something you should

23  look at.  It contains a list of information that each side has

24  to give the other right off the bat in a case.  Things like

25  what witnesses do you think you're going to rely on?  What

1    sorts of documents do you think you're going the rely on?  Each

2    side has to provide that to the other so that the other can

3    decide what further documents to request, what witnesses to

4    depose and that kind of thing.

5            So the Rule 26 disclosures will be due in two weeks

6    time.  So you should send that -- that doesn't come to the

7    court, that goes directly to the Attorney General.  And you've

8    got to make sure you include everything you might want to use

9    at trial because, if you put in your Rule 26 disclosures the

10   names of three witnesses, let's say, and then at trial you want

11   to call someone else, you're going to be precluded because you

12   never notified the defense that you want to call that person.

13           So even after you make your Rule 26 disclosures, if

14   you decide that there are additional documents or witnesses,

15   you have to keep supplementing your Rule 26 disclosures,

16   otherwise the defense can come in and say, hey, we didn't have

17   a chance to talk that person's deposition, you shouldn't let

18   that person testify.  You'll want to look at Rule 26 and make

19   sure you include in your Rule 26 disclosures everything that

20   you know of now that you might want to use, and you want to

21   make sure you supplement those disclosures.

22           I'm going to enter a scheduling order, and that will

23   be sent to you so you'll have that in writing, and it's going

24   to include dates by which each phase of discovery has to be

25   completed.  The whole thing is going to be completed in six

1    months, which is September 15th.  So I'm going to have

2    deposition cutoff of August 15th and all discovery

3    September 15.  And I'm assuming no expert discovery.

4           Let me ask Mr. Clark to find a conference date in the

5    second part of September.

6           And while he's doing that, let please alert the

7    parties to a pet peeve of mine, and that is requests for

8    discovery extensions that come on the eve of the cutoff, or

9    worse yet, after the cutoff.  I understand sometimes there's a

10   good reason why you need an extension; your client's in a coma,

11   all your documents got burned up in a fire.  Whatever it is.

12   If you have a good reason and you bring it to my attention when

13   you know about it, I will be reasonable and you will get your

14   extension.  But if I get a letter a week before the discovery

15   cutoff saying, you know, we haven't been able to arrange

16   depositions, that's going to tell me you haven't been paying

17   attention to the case, and in that event, I've been known to

18   say no.

19          You'll see that my scheduling order contains a

20   procedure you should follow if the other side is not playing

21   ball discovery wise.  Same rule applies if it's a third party

22   is not playing ball discovery wise.  It requires you to bring

23   any disputes to my attention on a fairly tight timeline, and

24   that's because I want to get you involved and keep you on

25   track.

1          So if you come in at the next conference and say,

2     well, we couldn't proceed because we have a discovery issue,

3     I'm going to say, well, you should have brought it to my

4     attention sooner than this, you're out of luck.

5          I mention this not because I'm expecting any

6     problems.  I say it whenever I enter a scheduling order just so

7     the parties know I have a little bit of a thing about this

8     issue and they know that they need to stay on top of the case.

9     And they shouldn't expect an extension for the asking.

10          So let me see what Mr. Clark found for a conference

11     date.

12          THE DEPUTY CLERK:  Yes, Judge.  September 29, 2022,

13     at 11:30 a.m.

14          THE COURT:  September 29 at 11:30 a.m.

15          If anybody is contemplating a motion at that time,

16     let me have the pre-motion letter on September 13 and the

17     response on the September 27 and we'll talk about it on --

18     actually, you know what, let me build in more time because the

19     defendant is upstate.  So September 8th for any pre-motion

20     letter, response September 22, and we'll talk about it

21     September the 29th.

22          The scheduling order will go to Ms. Hartofilis

23     electronically later today and it will go by mail to Mr. Brown.

24          Anything else we should talk about this morning?

25          MR. BROWN:  Yes, I see that you didn't mentioned page

```
 1   30 in my brief.

 2             THE COURT:  I'm sorry?

 3             MR. BROWN:  You never mentioned page 30.

 4             THE COURT:  What about it?

 5             MR. BROWN:  I had underlined some stuff in there.

 6             THE COURT:  What is it that you think I overlooked?

 7             MR. BROWN:  It just said a statement that I thought

 8   was overlooked.

 9             THE COURT:  Let me pull up page 30 and see what

10   you're talking about.

11             MR. BROWN:  All right.

12             THE COURT:  I mean, I read all your papers.  Page 30

13   of your brief.  Give me a second.

14             So the first thing you submitted was only five pages,

15   so that's not it.  Your opposition was ECF number 37.  Your

16   sur-reply was 39.  Let me look at that.  If that's what you're

17   talking about -- no, that was only four pages.

18             Are you talking about your amended complaint?

19             MR. BROWN:  Yes.

20             THE COURT:  Oh, all right.  Let me pull that up.

21             First amended complaint, page 30.  That's a copy of

22   your grievance.  Yes, this relates to the deprivation of

23   exercise claim which I ruled in your favor.

24             MR. BROWN:  I understand that, but I was just

25   bringing that to your attention because to my recollection
```

1   you're taking deliberate indifference under the Eighth

2   Amendment means the prison official must know or disregard the

3   excessiveness to an inmate.  And I underline, I say, it is

4   noted restraints are applied per DOCCS' policy, and every

5   precaution is taken to make sure restraints are not

6   compromised.  That's foreseeable.

7           THE COURT:  Well, and they screwed up this time, but

8   there was no evidence it was deliberate as opposed to

9   negligence.

10          MR. BROWN:  Okay.

11          THE COURT:  All right.

12          MR. BROWN:  I've got another question.

13          THE COURT:  Yes.

14          MR. BROWN:  Does this bar me from filing the state

15  claim?

16          THE COURT:  Well, you've got to look at Corrections

17  Law 24 which says you can't sue corrections officers for

18  negligence or torts within the scope of their duty.  You might

19  be able to sue the State of New York, but you can't sue the

20  corrections officers individually.

21          MR. BROWN:  Okay.

22          THE COURT:  I'm not saying you're able to sue the

23  State of New York.  If you were, it would be the Court of

24  Claims.  I just don't know offhand if that's true.  But the

25  individual officers are protected.

1          MR. BROWN:  Okay.

2          THE COURT:  All right.  So discovery will commence.

3    If you have no problems, I will talk to you again in the fall.

4          Everybody stay well.

5          MS. HARTOFILIS:  Your Honor, can I have the name of

6    the court reporter, I missed that at the beginning.

7          THE COURT:  Yes, it's Angela O'Donnell and you can

8    put in the request via the website.

9          MS. HARTOFILIS:  Perfect.

10         MR. BROWN:  Excuse me, Seibel.

11         THE COURT:  Yes.

12         MR. BROWN:  Yes.  I got another thing.  I will be

13   home in June.

14         THE COURT:  All right, well, when you get home, make

15   sure you send a letter with your address and your phone number

16   and email and all of that so we don't lose track of where you

17   are.

18         MR. BROWN:  All right.

19         THE COURT:  Make sure you let Ms. Hartofilis know

20   also.  She may want to wait until you're released to take your

21   deposition.

22         MR. BROWN:  Okay.  Have a blessed day.

23         THE COURT:  You too.  Bye, bye.

24         MR. BROWN:  Bye.

25         MS. HARTOFILIS:  Bye.  Thank you, your Honor.

1          (Proceedings concluded)

2   CERTIFICATE:  I hereby certify that the foregoing is a true and
    accurate transcript, to the best of my skill and ability, from
3   my stenographic notes of this proceeding.
                 _____
4   Angela A. O'Donnell, RPR,Official Court Reporter, USDC, SDNY

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25